# In the United States Court of Federal Claims

Nos. 17-465C, 17-473C

(Filed Under Seal: July 3, 2017)

(Reissued for Publication: July 13, 2017)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DELL FEDERAL SYSTEMS, L.P., and BLUE TECH INC., | \* \* \* \* |
| Plaintiffs, | \* \* |
| and | \* \* |
| IRON BOW TECHNOLOGIES, LLC, *et al.*, | \* \* |
| Plaintiff-Intervenors, | \* \* |
| v. | \* \* |
| THE UNITED STATES, | \* \* |
| Defendant, | \* \* |
| and | \* \* |
| ALPHASIX CORP., *et al.*, | \* \* |
| Defendant-Intervenors. | \* \* |

Bid Protest Challenging Agency
Corrective Action; Multiple Award
IDIQ Contracts; Proposal Discussions
Contrasted With Clarifications; Effect
of <u>Blue & Gold Fleet</u>; Declaratory and
Injunctive Relief.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Michael F. Mason,* with whom were *C. Peter Dungan, Christine Reynolds,* and *Thomas A. Pettit,* Hogan Lovells US LLP, Washington, D.C., for Plaintiff Dell Federal Systems, L.P.;

*Michael J. Anstett,* with whom were *James J. McCullough, Neaha P. Raol,* and *Brendan C. McNamara,* Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for Plaintiff Blue Tech Inc.;

---

[1] The Court issued this decision under seal on July 3, 2017, and invited the parties to submit proposed redactions of any proprietary, confidential, or other protected information on or before July 10, 2017. None of the parties proposed any redactions. Thus, the Court reissues the opinion in full.

*Joseph E. Ashman*, Trial Attorney, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Martin F. Hockey, Jr.*, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for Defendant;

*Jerry Alfonso Miles*, Deale Services, LLC, Rockville, Maryland, for Plaintiff-Intervenor Govsmart, Inc.;

*Maria L. Panichelli,* with whom was *Robert G. Ruggieri,* Cohen, Seglias, Pallas, Greenhall & Furman, P.C., Philadelphia, Pennsylvania, for Plaintiff-Intervenor Ideal Systems Solutions, Inc.;

*Thomas K. David*, with whom were *Kenneth D. Brody* and *Katherine A. David*, David, Brody & Dondershine, LLP, Reston, Virginia, for Plaintiff-Intervenor NCS Technologies, Inc.;

*Joseph P. Hornyak*, with whom were *Elizabeth N. Jochum* and *Rodney M. Perry,* Holland & Knight LLP, Tysons, Virginia, for Plaintiff-Intervenor Red River Computer Co., Inc.;

*Anthony J. Marchese*, with whom were *Carol L. O'Riordan, Pamela J. Bethel,* and *Taimur Rabbani,* O'Riordan Bethel Law Firm, LLP, Washington, D.C., for Defendant-Intervenor Alphasix Corp.;

*Daniel R. Forman*, with whom were *Jonathan M. Baker, Elizabeth A. Buehler,* and *Nkechi A. Kanu,* Crowell & Moring LLP, Washington, D.C., for Defendant-Intervenor HPI Federal, LLC;

*David M. Nadler*, with whom were *David Y. Yang, Adrien C. Pickard,* and *Philip E. Beshara,* Blank Rome LLP, Washington, D.C., for Defendant-Intervenor CDW Government LLC;

*Gerald H. Werfel*, with whom was *Ian A. Cronogue,* Baker, Cronogue, Tolle & Werfel, LLP, McLean, Virginia, for Defendant-Intervenor Insight Public Sector, Inc.;

*Anne B. Perry*, with whom were *Matthew W. Turetzky,* and *Keeley A. McCarty,* Sheppard Mullin Richter & Hampton LLP, Washington, D.C., for Defendant-Intervenor Sterling Computers Corp.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

Plaintiffs brought this bid protest to challenge the Department of the Army's decision to take corrective action after multiple previous protests had been filed at the Government Accountability Office ("GAO"). The underlying solicitation sought to procure commercial off-the-shelf computer hardware through indefinite-delivery, indefinite quantity contracts with the Army. Fifty-eight offerors submitted proposals, and the Army found only nine of those proposals to be technically acceptable. The Army awarded contracts to each of the nine technically acceptable offerors.

Twenty-one of the unsuccessful offerors filed protests at the GAO. The protesters mainly alleged that the solicitation contained several ambiguities causing the offerors to submit technically unacceptable proposals. The protesters argued that they could have corrected the flaws in their proposals if the Army had requested clarifications or engaged in discussions with offerors.

After analyzing the GAO protests, the Army determined that the GAO protests represented a significant litigation risk. The Army's counsel found that Department of Defense Federal Acquisition Regulation Supplement ("DFARS") § 215.306(c), in conjunction with a recent GAO decision, <u>In re Science Applications International Corp.</u>, B-413501.2, 2016 WL 6892429 (Nov. 9, 2016), meant that the Army was obligated to conduct discussions with offerors unless it had a reasonable basis for forgoing such discussions. The Army thought it possible that the GAO could find the Army lacked a reasonable basis to forgo discussions, and therefore it decided to implement corrective action by reopening the procurement, conducting discussions with virtually all of the offerors, and allowing offerors to resubmit proposals with new pricing. Complicating matters, the Army had disclosed the prices of the nine contract awardees.

Plaintiffs and Plaintiff Intervenors (the "Protesters")—six of the original contract awardees—now challenge the Army's corrective action. They argue that it was arbitrary and capricious for the Army to decide that corrective action was appropriate in this case. They further challenge the scope of the Army's corrective action, as well as the Army's decision to release their winning proposal prices. Those receiving contracts rightly complain that they would be at a significant competitive disadvantage in having to compete again for contracts they had rightly won in the first instance. They seek a permanent injunction that would forbid the Army from implementing the corrective action. Five of the previously unsuccessful offerors have joined this suit as Defendant-Intervenors. They, along with the Government, defend the Army's corrective action as a reasonable response to a reasonable assessment of litigation risk.

Most of the parties have submitted cross-motions for judgment on the administrative record.  The Court heard oral argument on the cross-motions on June 14, 2017.  After considering the parties' arguments, the Court finds that the Army's contemplated corrective action is not narrowly targeted to address the procurement defects the Army has identified.  While discussions would have been permissible *before* the Army announced its contract awards, the Army elected to make awards without discussions.  The administrative record reflects the consequences of that decision:  many offerors made minor errors filling out the Army-provided spreadsheets and submitted technically unacceptable proposals as a result.  These consequences are relatively minor, and the Court finds that clarifications and reevaluation would suffice to remedy them.  On the other hand, discussions paired with re-solicitation would represent a blunderbuss approach to corrective action that neither the record nor the law supports.  There is no reason to reopen the competition and invite new proposals, particularly where the Army's requirements have not changed.  Therefore, the Court GRANTS Plaintiffs' and Plaintiff-Intervenors' motions for judgment on the administrative record.  The Court similarly grants their motions for a permanent injunction barring the Army's proposed corrective action.  Defendant's and Defendant-Intervenors' motions are DENIED.  As the Court will explain, the Army surely can formulate some acceptable form of corrective action short of engaging in full-blown discussions and requesting a new round of proposals.  The simple use of clarifications and reevaluation of proposals would cause many of the unacceptable proposals to become acceptable, and thereby eligible for award.

## Background

### A.    The Army's Solicitation

The Army, acting through the Army Contracting Command at Rock Island, Illinois, issued Solicitation W52P1J-15-R-0122 on May 3, 2016.  AR Tab 17 at 153.[2]  The solicitation would begin a new iteration of the Army Desktop Mobile and Computing program, known as ADMC-3.  See id. at 155.  The Solicitation sought indefinite-delivery, indefinite-quantity contracts for "commercial-off-the-shelf (COTS) desktop computers, integrated desktop computers, workstations, electronic display, notebooks, tablet computers, slate, thin client, ultra-thin client, printers, multifunction devices and warranty."  Id.  The awardees would perform by filling firm fixed-price delivery orders.  Id.  The Army guaranteed that it would place a minimum of $10,000 in delivery orders with each awardee, which would "require each successful offeror to provide 1-2 laptops, tablets or peripherals to be determined at the time of award."  Id. at 156.  Still, the Army

---

[2]  References to "AR Tab __" refer to tabs in the administrative record.  All page numbers given use the pagination of the administrative record rather than that of individual documents within the record.  Furthermore, the Solicitation was amended ten times in ways that are not relevant to this case.  For ease of reference, the Court cites the first version (AR Tab 17).

contemplated ordering far more equipment under the contract, and the contract's total estimated value is $5 billion. Id. at 155; AR Tab 69 at 4324.

Offerors were evaluated based on "an integrated assessment of three evaluation factors:" Technical Approach, Past Performance, and Price. AR Tab 17 at 199. Factor 1 (Technical Approach) was divided into two subfactors: Equipment Submission Form and Business Process Form. Id. To be considered for an award, the solicitation required an "acceptable" rating for the Technical Approach (including both subfactors) and Past Performance factors. Id.

The solicitation directed offerors to submit their proposals in four "volumes:" Technical Approach, Past Performance, Price, and Contracts/Business. Id. at 195. Offerors were required to complete Army-provided Excel spreadsheets for the Equipment Submission form and Business Process Form subfactors as part of Volume 1. Id. For both subfactor spreadsheets, the solicitation instructed offerors to "complete all cell entries and the information provided shall demonstrate that the minimum requirements outlined in the Statement of Work (SOW) are met or exceeded." Id. at 196. The instructions also stated that "an incomplete or blank entry will indicate that the proposed item does NOT meet the minimum requirements." Id.

The Army intended to award "at least eight" contracts to the offerors who submitted the lowest-priced technically acceptable proposals, but reserved the right to make "as many, or as few, awards as deemed appropriate." Id. at 155. The awards would be divided into two categories: those reserved for small business, and those available through full and open competition. Id. at 198. For the first category, the Army intended to "select the five lowest priced Small Business Offerors for award, provided that five responsible small business proposals [were] found to be acceptable in all non-price factors." Id. For the full and open competition category, the Army intended to award three contracts to the non-small-business offerors who submitted the lowest-priced technically acceptable proposals. Id.

Finally, the solicitation stated that the Army "intend[ed] to award without conducting discussions with Offerors." Id. at 193.[3]   However, "the Government reserve[ed] the right to conduct discussions and to permit Offerors to revise proposals if determined necessary by the Contracting Officer." Id. Further, if the Army chose to open discussions, "all proposals, to include small business proposals previously removed for unacceptability . . . [would] be included," after which the Army would reevaluate proposals in accordance with the solicitation. Id. at 198. The Army similarly noted that it could, "solely at its discretion, enter into clarifications or communication as needed" with offerors as part of the evaluation process. Id. at 193.

---

[3]  The procurement concept of making award without discussions, even for a large dollar procurement, is not unreasonable when considering that the agency was acquiring commercial off-the-shelf equipment.

B.      The Army's Evaluation and Award Decisions

All proposals from offerors were due by August 4, 2016.  AR Tab 31 at 392.  Fifty-eight offerors had submitted proposals by that date (fifty-two from small businesses and six from large businesses).  AR Tab 69 at 4327.  The Army found that three of the fifty-eight proposals did not comply with the solicitation's requirements, so the Army only evaluated the remaining fifty-five proposals.  Id.  The Source Selection Evaluation Board ("SSEB") evaluated all offerors under the first factor (Technical Approach), and did not evaluate offerors' proposals under the other two factors if the offeror was rated unacceptable for the first factor.  See id. at 4329–30, 4334–40.  The SSEB rated only nine proposals acceptable under factor one, and rated each of these nine proposals acceptable under the other two factors.  Id.

In a briefing for the Source Selection Authority on the evaluation results, the SSEB addressed the possibility of discussions and recommended that the Army not conduct them.  Id. at 4347.  Specifically, the SSEB reasoned:

> 1)      We do not have a meaningful reason to open discussions
>
> 2)      Opening discussions would significantly delay award of ADMC-3 because:
>
> - Past performance team would have to evaluate and write past performance reports for 46 remaining offerors
>
> - All evaluation teams would have to evaluate final proposal revisions after discussions are opened
>
> 3)      Based on the prices and items being offered, opening discussions would not result in a greater variety of laptops, desktops, etc.

Id. at 4348.  Therefore, the Army did not conduct discussions, and it awarded contracts to the nine technically acceptable offerors on February 16, 2017 (it notified the unsuccessful offerors on the same date).  See AR Tabs 75–84.  The Army's letters to the unsuccessful offerors disclosed the nine awardees' total proposed prices.  AR Tab 84.

C.      The GAO Protests and the Army's Corrective Action

Twenty-one of the unsuccessful offerors filed protests with the GAO between February 21 and March 9, 2017 challenging the Army's award decisions.  See AR Tabs 85–105.  The GAO protesters primarily alleged that clerical errors and other misunderstandings concerning the Equipment Submission Form spreadsheet had led them

to submit technically unacceptable proposals.  Several protesters also argued that the Army should have engaged in discussions with offerors to resolve these spreadsheet-related misunderstandings.  In response to the protests, the Army instructed the nine awardees to stop work under their contracts on February 22, 2017.  AR Tab 106.

On March 21, 2017, the Army advised the GAO that it planned to take corrective action in response to the twenty-one protests.  AR Tab 107a.  The Army announced that it would open discussions with all remaining offerors, request final proposal revisions with revised pricing, and issue new award decisions.  Id.  The Army documented its reasons for taking corrective action in a Memorandum for Record ("MFR") dated March 22, 2017.  AR Tab 110b.  The MFR mainly quotes a previous memorandum prepared by George Farley, an Army Attorney-Advisor.  Id.  Mr. Farley explained the possible impact of DFARS § 215.306(c) on the pending GAO protests.  Id. at 5832.  That section states, "for acquisitions with an estimated value of $100 million or more, contracting officers should conduct discussions."  Mr. Farley noted that while no GAO decision had overturned an agency decision not to conduct discussions in a procurement valued over $100 million, "the GAO will review these cases to ensure the agency's rationale for not holding discussions is reasonable."  Id. at 5832.

Through the lens of a hypothetical GAO review, Mr. Farley found that the Army's grounds for not conducting discussions likely were unreasonable.  First, he found that the agency's desire for convenience in not evaluating and writing past performance reports for the forty-six remaining offerors did not pass muster.  Id. at 5833–34.  He noted that "[b]eing convenient or providing an efficiency to the Agency is rarely, if ever, a reasonable rationale for the Agency to not comply with a provision of law."  Id. at 5834.  He further found the Army's "no greater variety of laptops, desktops, etc." reason unavailing:

> This stand-alone statement, which does not specifically address the more advantageous pricing of the majority of the unacceptable offerors' proposals, is the Agency's best argument for not opening discussions.  But, in order to determine reasonableness, we must look at the totality of the circumstances.  Therefore, we must weigh the reasonableness of this statement, along with the RFP language that the Agency intended to award without Discussions, against the issues raised regarding unreasonable behavior by the 20 protesters.  As summarized above, these issues lend themselves to showing that the spreadsheet errors could have easily and quickly been resolved.  Additional issues raised impart either an ambiguity in the requirements or the Government's instructions how to fill out the spreadsheet.  A couple of these issues are:

a.      The hard-line issue regarding Hard-Drive versus Solid-State Drives;

b.      Stating that an upgrade must be an increase in capability but then stating that selection of an item in a drop-down is acceptable when there are items in the dropdown that are not upgrades to a base model.

These specific issues are detrimentally supported by the Agency's own evaluation when it states that the fifth (5th) most common reason that proposals were found Technically Unacceptable was "the offeror proposed items that did not meet the minimum requirements" of the Agency.  Given that the language for the first two (2) reasons is that "the offeror selected 'NA' instead of filling in a required field" and the "offeror provided an incomplete or blank entry which indicates" the item does not meet our requirements, the logical conclusion is that the first two (2) reasons were merely compliance issues with filling out the form rather than a deficiency in the item proposed.

Id.  He concluded that, because of these issues, there was "significant litigation risk in defending these [GAO] protests."  Id.  Mr. Farley then suggested a possible course for corrective action:

If the Agency were to take corrective action based on the litigation risk, we would be able to resolve all issues alleged in these protests and make a new award decision that is simply based on price alone. . . .  By only allowing revisions to areas previously determined as deficiencies and allowing Offerors to change price the evaluation would be a reassurance that the Offerors changed the spreadsheet in accordance with our evaluation notice.  Allowing Offerors to change price would also benefit the Agency by getting offers that are a better value to the Government.

**RECOMMENDATION:** Due to the significant litigation risk, the ambiguities in the spreadsheet and SOW, and a matter of policy to do what is right, I recommend that we take limited corrective action to resolve the issues with Offerors' Technical Proposals."

8

Id. at 5835.  The Army MFR adopts Mr. Farley's position, and does not give further reasons for the Army's corrective action.

On March 23, 2017, the GAO dismissed all twenty-one protests as academic in response to the Army's notice of corrective action.  AR Tab 110c at 5836–37.  The next day, the Army sent letters to the fifty-five evaluated offerors.  See AR Tab 112.  In the letters, the Army advised technically unacceptable offerors of the deficiencies in their original proposals and instructed them to submit their "best and final" proposals.  See, e.g., id. at 6013.  To the previous awardees, the Army stated, "If you make changes to areas of your technical proposal that have already been found acceptable, you are at risk of being found technically unacceptable."  See, e.g., id. at 5861.  In all of its letters, the Army further added, "For the Price proposal, you are authorized to change your prices to your best and final prices."  Id.

D.    The Original Awardees' Current Protest

Dell Federal Systems, L.P. filed this bid protest challenging the Army's corrective action on March 31, 2017.  The protest seeks a declaratory judgment that the corrective action is unlawful, as well as a permanent injunction barring the corrective action.  See Dell Compl. at 8, Dkt. No. 1.  Blue Tech Inc. brought a related protest, and the Court consolidated the two protests on April 3, 2017.  Dkt. No. 29.  The Government notified the Court on the same date that the Army would voluntarily stay its corrective action for the duration of this protest.  Dkt. No. 22.  Five other original awardees—Iron Bow Technologies, LLC, Govsmart, Inc., Ideal System Solutions, Inc., NCS Technologies, Inc., and Red River Computer Company, Inc.—have joined this case as plaintiff-intervenors.  Similarly, six of the losing offerors have joined this case as defendant-intervenors:  Alphasix Corp., HPI Federal, LLC, CDW Government LLC, Insight Public Sector, Inc., Integration Technology Groups, Inc., and Sterling Computers Corp.

The Government and all but one of the defendant-intervenors (Integration Technology Groups) filed motions for judgment on the administrative record on May 3, 2017.  The plaintiffs and all but one of the plaintiff-intervenors (Iron Bow Technologies) filed cross-motions on May 17, 2017.  The parties completed briefing on May 31, 2017, and the Court heard oral argument on the cross-motions on June 14, 2017.

Discussion

A.    Jurisdiction and Standard of Review

The Tucker Act grants this Court subject matter jurisdiction over bid protests.  28 U.S.C. § 1491(b)(1) (2012).  The protesters also have standing to challenge the Army's proposed corrective action despite their status as current contract awardees, as a protest of corrective action "is in the nature of a pre-award claim."  Sheridan Corp. v. United States,

95 Fed. Cl. 141, 148 (2010) (quoting <u>IMS Servs., Inc. v. United States</u>, 32 Fed. Cl. 388, 398 (1994)).

In a bid protest, the Court reviews agency decisions—including decisions pertaining to corrective action—pursuant to the standards set out in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4) (2012); 5 U.S.C. § 706 (2012).  Under the APA, this Court shall set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2012); <u>see</u> <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004).  An agency's decision does not violate the APA if the agency "provided a coherent and reasonable explanation of its exercise of discretion."  <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001).

This standard is the same when a Court must consider an agency's corrective action.  "Contracting officers are provided broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition."  <u>Sheridan</u>, 95 Fed. Cl. at 151 (citation omitted).  Therefore, in cases involving corrective action, "the agency's corrective action must be rationally related to the defect to be corrected."  <u>Id.</u> (citation omitted).  The evidence in the record must show that the agency (1) identified a defect in the procurement, and (2) considered the ways in which its corrective action would remedy the defect.  <u>See id.</u>  The Court's review is deferential to the agency as long as the agency has rationally explained its corrective action decision.  <u>Id.</u> (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000).  Finally, even if the agency acted without a rational basis, the Court cannot grant relief unless the agency's action prejudiced the protester.  <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

B.    <u>The Army's Contemplated Corrective Action is not Rationally Related to Defects in the Procurement</u>

The parties' dispute encompasses both elements of the corrective action analysis.  First, the parties dispute the existence of a procurement defect in need of correction.  Next, the parties disagree as to the appropriate scope of the Army's corrective action.  The Court will address each of the parties' arguments in turn.

1.    <u>The Army Rationally Identified Procurement Defects</u>

The Government and Defendant-Intervenors have pointed to two defects in the Army's procurement.  First, they argue that the Equipment Submission Form spreadsheet the offerors were required to submit with their proposals contained latent ambiguities.  Second, they argue that DFARS § 215.306(c) required the Army to conduct discussions unless it reasonably concluded that discussions were unnecessary.  According to this view, the Army's decision not to conduct discussions had no reasonable basis in the record, so

the failure to conduct discussions was itself a defect.  The Protesters argue that any claims predicated upon these alleged defects were waived after the close of the bidding process, so it was irrational for the Army to decide to take corrective action to remedy the defects. In the alternative, they argue that there were no defects in the procurement that could serve as the basis for corrective action.

a.   The Timeliness of the GAO Protests has no Bearing on the Rationality of the Army's Decision to Take Corrective Action

As a threshold matter, the Protesters maintain that any claims the GAO protesters might have made about the Army's failure to conduct discussions and ambiguities in the solicitation were waived under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007).  Pursuant to Blue & Gold Fleet, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection" after the close of the bidding process. Id. at 1313.  This waiver rule ensures that protesters do not sit on their rights and thereby force more expensive litigation after the agency has closed the bidding process. Id. at 1314 (citation omitted).  The protesters here argue that if the GAO protesters' claims were waived, then it was irrational for the Army to conclude that it faced litigation risk from the GAO protests, and therefore also irrational to institute corrective action.

The Court disagrees.  Even if the GAO protesters had waived their claims under Blue & Gold Fleet—a question the Court need not address—it still would be reasonable for the Army to decide to institute corrective action.  While the MFR did cite litigation risk as a reason for instituting corrective action, that litigation risk did not stand alone.  Rather, the MFR predicates its litigation risk assessment on two apparent procurement defects: (1) common errors offerors made when completing their Equipment Submission Forms, and (2) the Army's decision to forgo discussions.  Therefore, it is important conceptually to separate the litigation risk assessment from the procurement defects that caused the risk. Litigation risk itself is not a procurement defect that can be the predicate for corrective action.  Rather, when agency counsel acknowledges litigation risk in a bid protest, he acknowledges that the procurement may have contained defects.  When the agency takes corrective action in response to its counsel's assessment, the agency's corrective action targets these defects rather than any legal liability.  Therefore, it is reasonable for an agency to take corrective action to remedy procurement defects even where the agency may have faced no litigation risk because it may have won a protest on procedural grounds.

Both the Federal Acquisition Regulation ("FAR") and applicable case law support this view.  FAR § 1.602-2(b) requires contracting officers to ensure "that contractors receive impartial, fair, and equitable treatment."  Similarly, as this Court noted in Sheridan, contracting officers are vested with broad discretion to take corrective action when doing so would ensure fair and impartial competition. 95 Fed. Cl. at 151.  Neither the FAR nor

11

any other law limits the contracting officer's discretion to decide to take corrective action when confronted with a procurement defect, even where a protest founded upon that defect might be untimely.

Furthermore, the GAO has found that contracting officers have discretion to take corrective action in a situation similar to the case at bar:

> [I]t is not necessary for an agency to conclude that the protest is certain to be sustained before it may take corrective action; rather, where the agency has reasonable concern that there were errors in the procurement, we view it as within the agency's discretion to take corrective action even if the protest could be denied.

In re Integrated Sci. Sols., Inc., B-406025, 2012 WL 362186, at *2 (Jan. 17, 2012). The GAO's approach is especially prudent where a protest could be denied as untimely under Blue & Gold Fleet. The Blue & Gold Fleet waiver rule protects agencies from expensive litigation; it is not meant to deter agency action that would remedy procurement defects. It would therefore be illogical to allow the Protesters here to use this waiver rule as a club to prevent the Army from addressing errors it has discovered in its procurement. Thus, the Court finds that the timeliness or untimeliness of the GAO protests alone does not render the Army's corrective action irrational.

     b.  <u>The Army Rationally Determined That Spreadsheet Ambiguities and the Failure to Conduct Discussions Were Procurement Defects</u>

It stands to reason that an agency cannot take action to correct a procurement if the procurement is not defective. See Sheridan, 95 Fed. Cl. at 151. Here, the Army (through agency counsel) identified two procurement defects in its MFR: (1) ambiguities in the spreadsheets that offerors were required to submit as part of their proposals, and (2) the Army's failure to conduct discussions (or adequately consider the reasonableness of conducting discussions).

First, it was rational for the Army to find defects in the ambiguous spreadsheets. In the MFR, Mr. Farley identified "a couple" examples of spreadsheet ambiguities. See AR Tab 110b at 5834. He also noted that the Army had recognized offerors' common failure to fill out certain parts of the Equipment Submission Form correctly. Id. As set out in full above, he identified two representative examples of ambiguity: (a) "The hard-line issue regarding Hard-Drive versus Solid-State Drives"; and (b) "Stating that an upgrade must be an increase in capability but then stating that selection of an item in a drop-down is acceptable when there are items in the dropdown that are not upgrades to a base model."

Id. He found that these mistakes were not substantive, but merely "compliance issues with filling out the form."

At oral argument, the Government discussed the "hard line issue" the MFR cites as an example. See Oral Arg Tr. at 65–67, Dkt. No. 135 (June 14, 2017). This issue can be seen in AR Tab 18 (performance notebook sheet). A slightly thicker black line appears between the top three rows of the "operating system" column and the bottom three rows. This circumstance could have led offerors to believe that the top three line items relate to the hard disk drive component, whereas the bottom three line items relate to the solid state disk drive. As the Government notes, "if an offeror was to propose a hard disk drive, it would reasonably understand the spreadsheet's instructions to mean that the offeror did not have to complete rows 27 and 28 and could simply select 'NA.'" This was not the case, as the Army expected offerors to fill in all line items. The hard line issue misled an astonishing nineteen offerors, who were then found technically unacceptable. See Def. Demonstrative 2. Therefore, it was rational for the Army to conclude that spreadsheet ambiguities such as the hard line issue represented a procurement defect. Put simply, the Army's spreadsheet confused offerors and led many of them to input their line item responses incorrectly. As a result, the Army found many offerors technically unacceptable.

The Court also finds that the Army reasonably considered its failure to conduct discussions to be a procurement defect. The MFR devotes the bulk of its analysis to this issue. See AR Tab 110b at 5832–34. The argument starts with DFARS § 215.306(c), which states, "for acquisitions with an estimated value of $100 million or more, contracting officers should conduct discussions." The MFR then discusses In re Science Applications International Corp., B-413501.2, 2016 WL 6892429 (Nov. 9, 2016) ("SAIC"), a recent GAO case that interprets DFARS § 215.306(c). In SAIC, the GAO found that the regulation means "discussions are the expected course of action in DoD procurements valued over $100 million, but that agencies retain the discretion not to conduct discussions if the particular circumstances of the procurement dictate that making an award without discussions is appropriate." Id. at *8. Therefore, the GAO reviewed the record to determine whether, "given the particular circumstances of this procurement, . . . there was a reasonable basis for the agency's decision not to conduct discussions." Id. This was the correct standard of review in spite of the agency's statement in the solicitation that it intended to award a contract without conducting discussions. Id. In the end, the GAO examined the reasonableness of the agency's decision to forgo discussions using three factors: (1) whether there were deficiencies in the protester's proposal, (2) whether "the awardee's proposal was evaluated as being technically superior to the other proposals," and (3) whether "the awardee's price was reasonable." Id. at *9. The solicitation met these criteria, so the agency's decision to forgo discussions in SAIC was reasonable. Id.

The MFR addresses SAIC warily, noting, "Because the SAIC case has now incorporated a means for the GAO to give greater scrutiny to the reasonableness of the Agency's decision to not open discussions, we must also look at the underlying rationale,

and not just give automatic deference to the contracting officer's decision." AR Tab 110b at 5833. The MFR then turns to the reasons the Army (through the SSEB) gave for not conducting discussions—the effort involved in evaluating forty-six more proposals, as well as the fact that there would be no greater variety of computer equipment—and finds them wanting. First, the MFR states, "Being convenient or providing an efficiency to the Agency is rarely, if ever, a reasonable rationale for the Agency to not comply with a provision of law. Therefore, the first reason annotated for not conducting Discussions is not reasonable." Id. at 5834. The MFR also notes that the "totality of the circumstances" showed that the Army's "no greater variety of laptops, desktops, etc." reason was better, but predicted that this reason might not withstand scrutiny given the ease with which the offerors could have revised their proposals. Id. Therefore, the MFR identified the failure to conduct discussions as a procurement defect.

The Court finds the MFR's interpretation of DFARS § 215.306(c) and SAIC reasonable. Here, it is important to note that the Court does not review an agency's legal conclusions about potential procurement defects de novo, as would an appellate tribunal. Rather, the Court's role is to review agency decisions for their rationality. Therefore, the Court finds that it was rational for the Army to find that it may have failed the reasonableness test articulated in SAIC when it decided to forgo discussions. The Court finds that the Army's reasons for forgoing discussions, which are only articulated on one slide in a PowerPoint presentation, are threadbare and conclusory. It is true that here, as in SAIC, the Army announced that it would not conduct discussions. However, when confronted by a situation in which the majority of the offerors appear to have been disqualified because of minor spreadsheet errors, one would expect the Army to explain its reasoning a bit more. After all, had the Army conducted discussions before it awarded its nine contracts, several of the lower-priced offerors may have revised their proposals and been found technically acceptable. Therefore, it was rational for the MFR to find that the Army's failure to conduct discussions constituted a procurement defect.

In sum, the Army rationally identified two procurement defects: (1) ambiguities in the Equipment Submission Form, and (2) the Army's failure to hold discussions.

2.    The Army's Contemplated Corrective Action is Overbroad

Even where an agency has rationally identified defects in its procurement, its corrective action "must narrowly target the defects it is intended to remedy." Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 115 (2013) (citing Sheridan, 95 Fed. Cl. at 153). For example, in Amazon, the GAO found two defects. Id. at 115–16. The first defect was a "price evaluation error" that only affected one part of the procurement. Id. at 115. Therefore, the agency should have simply reevaluated the proposals rather than opening discussions and soliciting final proposal revisions. Id. For the second defect, the GAO found that the agency had impermissibly waived one of the solicitation's material terms. Id. at 116. Instead of targeting its corrective action to the affected portion of offerors'

proposals, the agency impermissibly "elected to use [the defect] as an opportunity to amend other aspects of the solicitation."  Id. (citation omitted).

This case differs from Amazon in that the defects here are not mere evaluation errors.  Still, the same overbreadth principle applies:  an agency cannot use relatively minor defects to justify the full-scale opening of discussions and allowing revisions to proposals that do not relate to the defects.  Here, the Army attempted to craft corrective action that addressed both defects (the ambiguous spreadsheet and the failure to conduct discussions).  It opened discussions with all fifty-five remaining offerors and allowed wholesale proposal revisions as long as those revisions responded to the Army's Evaluation Notices ("ENs").  See, e.g., AR Tab 112 at 5960.  Those ENs targeted errors not only on the Equipment Submission Form, but also on the Business Process Form.  See, e.g., id. at 5914.  The Army also allowed offerors to revise their final prices in any way they desired.  The broad scope of the corrective action is puzzling because the Army's requirements had not changed, and the contracting officer did not amend the Solicitation when it opened discussions (as the agency had done in Amazon).  In sum, the Army opened discussions in which all remaining offerors, no matter how egregiously they had erred in their initial proposals, simply received a second chance at submitting compliant proposals under an unchanged solicitation.

If the Army wished to comply with the GAO's SAIC decision, it would have been reasonable for the Army to conduct open-ended discussions *before* it awarded its contracts.  However, now that the contracts have been awarded, any damage caused by not holding discussions—including the disqualification of several offerors as a result of clerical errors—has been done.  The question now is whether holding post-award discussions is a rational remedy for failing to hold pre-award discussions, and the Court finds that this conclusion does not follow.  After all, constructing a henhouse gate is not an appropriate remedy after the fox has done its work—one instead needs new chickens.

With that heavy-handed analogy in mind, there is a more narrowly targeted post-award solution that the Army entirely failed to consider: clarifications and reevaluation.  After the agency has received proposals, it may engage in clarification exchanges with offerors pursuant to FAR § 15.306(a).  These clarifications "are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated."  48 C.F.R. § 15.306(a)(1).  Furthermore, "[i]f award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals . . . or to resolve minor or clerical errors."  Id. § 15.306(a)(2).  Though they address minor or clerical errors, clarifications can result in substantive changes to an offeror's proposal; for example, "clarifications by one offeror could lead to an increase in its past performance score or perhaps tilt the award in its favor."  Info. Tech. & Appl. Corp. v. United States, 316 F.3d 1312, 1323 (Fed. Cir. 2003) (citation omitted).  Still, clarifications "are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the

proposal." <u>JWK Int'l Corp. v. United States</u>, 52 Fed. Cl. 650, 661 (2002), <u>aff'd</u>, 56 F. App'x 474 (Fed. Cir. 2003) (quoting <u>Charleston Marine Containers, Inc.</u>, B-283393, 1999 WL 101556884, at *4 (Nov. 8, 1999)).  Thus, the general rule is that clarifications are appropriate for correcting non-material or clerical errors.  More substantive exchanges require discussions.

   <u>Griffy's Landscape Maintenance LLC v. United States</u>, 46 Fed. Cl. 257 (2000) aptly illustrates the purpose and proper use of clarifications.  In <u>Griffy's Landscape</u>, the Court addressed a negotiated procurement in which a bidder's "insurance point of contact information" was missing from its proposal.  <u>Id.</u> at 257.  Therefore, the Army evaluated the bidder negatively under the past performance factor.  <u>Id.</u>  The Army did not hold discussions with offerors, but simply awarded the contract to a different bidder, even though that bidder had submitted a much higher price.  <u>Id.</u> at 258.  The Court found that the Army had a "duty to inquire" about the absence of this point of contact information, noting that "the government should not be deprived of the best possible contract because of a contractor's clerical error."  <u>Id.</u> at 259–60.  Faced with such a minor omission, the Army's decision not to seek clarification from the bidder was irrational.  <u>Id.</u> at 261.  In reaching its conclusion, the Court distinguished GAO decisions such as <u>Charleston Marine</u>, finding that in such cases "the contractors both failed to submit important information and submitted incorrect or non-responsive information.  There was no indication this was due to a clerical error.  There is a world of difference between material deficiencies and a lost name and number."  <u>Id.</u>  The Court concluded, "The government's obligation is clear and simple.  If it suspects a clerical error, it must ask."  <u>Id.</u> at 261.

   Though <u>Griffy's Landscape</u> did not analyze clarifications as a means of corrective action, the Court finds that the principles articulated in that case are relevant here.  As in <u>Griffy's Landscape</u>, the Court finds that many of the losing offerors in this procurement made minor or clerical errors that fall within the purview of FAR § 15.306(a).[4]  Many of the offerors here did not make material mistakes; rather, they filled out a confusing Excel spreadsheet incorrectly.  Mistakenly omitting information from a spreadsheet in this way is akin to the bidder's omission of minor point-of-contact information in <u>Griffy's Landscape</u>.  Furthermore, as in <u>Griffy's Landscape</u>, the Army had notice that a clerical error had likely occurred.  In <u>Griffy's Landscape</u>, the Army had previously contracted with the bidder, so it should have known that the bidder had compliant insurance information.  <u>Id.</u> at 260.  Similarly, the Army here knew that ambiguities in its spreadsheet had likely caused offerors to make clerical errors.  Indeed, the MFR itself acknowledges the "logical conclusion" that offerors were disqualified because of "mere[] compliance issues with filling out the form rather than a deficiency in the item proposed."  If this language does

---

[4] Courts have since maintained that the holding in <u>Griffy's Landscape</u> should be limited to clerical errors. <u>See, e.g.</u>, <u>C.W. Over & Sons, Inc. v. United States</u>, 54 Fed. Cl. 514, 521 n.10 (2002).  In citing <u>Griffy's Landscape</u> here, the Court does not disturb their conclusion, as the errors many of the offerors made here were clerical.

not suggest the Army knew that offerors had made clerical errors, it is difficult to see what would.

As such, it was irrational for the Army not to seek clarification from all offerors it knew had been directly affected by the ambiguities it had identified in its own spreadsheet. Doing so would not have given all offerors the chance to make their proposals technically acceptable—there are several offerors who made more wide-reaching errors—but it would have given the offerors who justifiably thought they were proposing compliant equipment the chance to show that they were in fact proposing compliant equipment. The Army then could have reevaluated the offerors' proposals instead of resoliciting new proposals.

In sum, it was irrational for the Army to fail to consider clarifications and reevaluation of proposals as a more natural expedient for the minor clerical errors it had identified. The Army instead opened wide-reaching discussions with all remaining offerors and allowed all offerors to submit modified proposals with new prices, despite having disclosed the awardees' winning prices.[5] This is manifestly overbroad; in fact, it is akin to killing an ant with a sledgehammer when a rolled-up newspaper would have sufficed. Therefore, the Court finds that the Army's corrective action is not rationally related to any procurement defects.

C.     The Army's Action Prejudiced the Protesters

A court cannot grant relief in a bid protest unless the agency's unlawful action has prejudiced the protesters. See Bannum, 404 F.3d at 1351. In pre-award protests and, consequently, in protests challenging corrective action, a protester establishes prejudice by showing "a non-trivial competitive injury which can be addressed by judicial relief." Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 320 (2015) (quoting Sys. Appl. & Techs., Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012)). Here, the Army's overbroad corrective action constitutes a non-trivial competitive injury because it substantially decreases the chance each of the Protesters otherwise has of receiving an award. Had the agency followed the more logical step and engaged in clarification exchanges, the Protesters would have had a greater likelihood of receiving contract awards because their initial proposals were compliant and all but one of their proposed prices were in the lower half of the fifty-five offers. See Def. Demonstrative 1 (highlighting awardees'

---

[5] Disclosure of the awardees' winning prices here was lawful. See Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. 362, 391 (2012). Allowing wholesale price revisions without any record support was not. Neither the MFR nor the rest of the administrative record provide support for allowing price revisions. The MFR states merely that "[a]llowing Offerors to change price would also benefit the Agency by getting offers that are a better value to the Government." While true, this statement on its face does not provide a rational basis for soliciting new prices. See, e.g., WHR Grp., Inc. v. United States, 115 Fed. Cl. 386, 398 (2014) ("[T]he contracting officer's bald assertions in the notes to file will not suffice because the agency failed to examine the relevant data and articulate a coherent and reasonable explanation for their decision.") (citation omitted).

prices amid all proposed prices). As it is, the Army's round of discussions opens the door for all offerors to revise their proposals and prices such that they become more competitive. The Court is capable of fashioning relief to address this competitive injury. Therefore, the Protesters have established prejudice.

D.   The Protesters are Entitled to Relief

The Protesters seek both declaratory relief and a permanent injunction on the Army's corrective action. The Court may award "any relief that [it] considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2). First, the Court grants declaratory relief for the reasons stated above. The Court finds the Army's contemplated corrective action manifestly overbroad, and therefore irrational and unlawful.

Second, the Court grants the Protesters' request for a permanent injunction. A court may grant injunctive relief if "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citation omitted). Here, the Protesters have succeeded on the merits. Second, the Court finds that the Protesters would suffer irreparable harm if the court withholds injunctive relief. The Protesters would be forced to recompete wholesale for contracts they have already won. Further, as in Sheridan, discussions would also force the Protesters to bid against their own prices. See 95 Fed. Cl. at 155.

The Court also finds that the balance of hardships favors the Protesters here. The Government would suffer some hardship if it decided to engage in more limited clarification exchanges, as this would require more effort on top of the effort already expended in drafting its ENs. Still, in fashioning its clarification questions, the Government would be free to look to offerors who stand a realistic chance of receiving an award after clarifications; in other words, the Army would not need to review every single proposal anew, as it would if it followed its current corrective action plan.[6] In contrast, the Protesters would face an elevated risk of losing their awards if the Army were to conduct discussions. Thus, the balance of hardships favors the Protesters.

Finally, the public interest favors granting injunctive relief here. Corrective action is something the judicial system should and does encourage. Still, allowing an agency to respond disproportionately to minor procurement errors harms the integrity of the procurement system because it introduces an unfair and unanticipated additional layer of competition to a procurement. Agencies have broad discretion to institute corrective

---

[6] Moreover, counsel for the Government indicated at oral argument that it would be "a very easy fix" to craft more narrowly-targeted corrective action if the Court were to find the Army's current corrective action plan too broad. See Oral Arg. Tr. at 74.

action, but offerors should be secure in the knowledge that any corrective action an agency implements will narrowly target the procurement defects the agency has identified. Finally, enjoining the Army's current corrective action plan does not mean the Army cannot pursue more reasonable corrective action within the boundaries described above. Therefore, granting a permanent injunction is in the public interest in this case.

Conclusion

Plaintiffs and Plaintiff-Intervenors' cross-motions for judgment on the administrative record are GRANTED.  Defendant and Defendant-Intervenors' motions for judgment on the administrative record are DENIED.  Having found that the prerequisites for entering a permanent injunction are satisfied, the Court hereby permanently ENJOINS Defendant from conducting its proposed corrective action.  The Clerk is directed to enter judgment for Plaintiffs and Plaintiff-Intervenors.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge